2022 IL App (1st) 210955-U

No. 1-21-0955

Filed August 18, 2022

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 94 CR 25737 |
| | ) | |
| DARRYL WASHINGTON, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Petitioner-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: Circuit court's denial of petitioner's motion for leave to file a successive postconviction petition is reversed where supporting affidavits made a colorable claim of actual innocence.

¶ 2    Darryl Washington appeals from the circuit court's denial of his motion for leave to file a successive postconviction petition claiming that he is actually innocent of the first degree murder and home invasion for which he was convicted.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                                    I. BACKGROUND

¶ 4          Washington and codefendant Pierre Willhite were charged with first degree murder, home invasion, and other offenses in connection with the December 5, 1993 shooting death of Edmund Green. After denying requests from both defendants to sever their trials, Washington and Willhite were tried jointly before the same jury.

¶ 5          In opening statements, the State asserted that the evidence would show that three people entered an apartment in the Wicker Park neighborhood of Chicago and all three fired handguns. Conceding that it could not prove which of the shooters fired the bullets that killed Green, the State asserted that Washington and Willhite were both accountable for Green's murder since the evidence would show both men "were there and were involved in aiding and abetting the entire crime in some way." Washington's counsel countered that Washington was not present, was not one of the three men who entered the apartment, and that witnesses misidentified him.

¶ 6          The State presented testimony that Willhite came to the apartment on West Division Street in Wicker Park earlier that day. Elvis Valentin lived in the apartment with his mother and other family members. Willhite asked Valentin's girlfriend, Dalila Robles, to speak to Valentin and she called out to him. Willhite believed Robles had used a racial epithet to refer to Willhite and they began to argue. Valentin returned from taking garbage out and began to argue with Willhite, explaining that Robles had not used a racial epithet. Eventually, Valentin punched Willhite in the jaw. Willhite exited the building but vowed, "I'll be back." Valentin observed Willhite enter a vehicle that drove away but was unable to see the other occupants. Worried that Willhite would follow through with his threat, Valentin called his friends Edmund Green and Edgar Perez, requesting they come to the apartment.

¶ 7    Approximately one hour later, someone knocked on the apartment door and asked for Valentin. Valentin's mother, who had answered the door, stated he was not present, although, in truth, he was in a rear bedroom. Minutes later, Green and Perez arrived and entered the apartment. Another knock on the door followed. Green opened the door and, immediately, a barrage of gunshots were fired into the apartment. Green and Luis Cruz, the boyfriend of Valentin's sister, Sylvia Ramos, managed to push the door closed but were both struck by bullets. Green was hit in the head and back, and eventually succumbed to his wounds. Cruz survived. Police recovered numerous shell casings and fired bullets of three different calibers inside or just outside of the apartment.

¶ 8    The only witness who claimed to directly observe Washington participate in the shooting was Sylvia Ramos. About two weeks after the shooting, on December 18, 1993, she tentatively identified Washington in a photo array but stated she would need to see him in person to be more certain. Ramos identified Washington in a physical lineup about a month later, on January 21, 1994, as one of the shooters.

¶ 9    Edgar Perez identified Willhite as one of the shooters and testified that he observed one of the other shooters, but that person was not Washington. Perez identified Washington only as a person he often observed in Willhite's company.

¶ 10    Washington called witnesses who testified that they were familiar with both him and Willhite but that they had never observed the two together. One witness, Sam Williams, testified that he and Washington left the Wicker Park field house at the same time on December 5, 1993, and headed in opposite directions. Williams went to Valentin's apartment building to visit him and after hearing gunshots, observed the shadows of two young men, neither of whom were Washington, fleeing down the rear staircase.

¶ 11        Washington's mother testified that he was injured while working construction in June 1993 and was shot in the clavicle in September 1993. According to her, these injuries limited his ability to perform basic tasks and he only regained self-sufficiency in January 1994.

¶ 12        The jury found Washington guilty of the first degree murder of Green, the aggravated battery with a firearm of Cruz, and home invasion. The court sentenced him to 60 years for murder, followed by a consecutive term of six years for home invasion.[2]

¶ 13        This court affirmed Washington's conviction on direct appeal, rejecting his claims that he was arrested without probable cause and that the prosecutor's remarks in closing argument deprived him of a fair trial. *People v. Washington & Willhite*, Nos. 1-98-0228 & 1-98-0984 cons. (1999) (unpublished order pursuant to Supreme Court Rule 23).

¶ 14        In 2000, Washington filed a *pro se* postconviction petition asserting claims of ineffective assistance of counsel for failure to present various exculpatory evidence. The court advanced the petition for further proceedings and appointed counsel to assist. Counsel supplemented the petitions with claims regarding Washington's sentence. The circuit court dismissed the petition on the State's motion to dismiss, finding that Washington had not made a substantial showing of a constitutional deprivation. This court affirmed that judgment after appointed counsel filed a brief pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), stating that the appeal had no arguable merit and requesting to withdraw.

¶ 15        In 2020, Washington filed the instant *pro se* motion for leave to file a successive postconviction petition. The motion stated that Washington seeks leave to file a successive petition

---

[2]The mittimus indicates that Washington was also convicted of aggravated battery with a firearm but does not indicate a sentence associated with that count. The transcript of the sentencing hearing is also silent as to a sentence or other disposition of that count.

asserting that he is actually innocent and various claims of ineffective assistance of trial and appellate counsel.

¶ 16    To support his actual innocence claim, Washington attached affidavits from Michael Robinson and Marshall Hudson, both fellow inmates in the Illinois Department of Corrections (IDOC). In relevant part, Robinson's affidavit, dated July 27, 2020, reads as follows:

"Between the years of 2011-2012 I met Pierre Willhite in Hill Correctional. *** He told me about his case and how he and some guys went to rob a guy and things went wrong because the guy tried to close the door of the apartment on them and be for [sic] the guy they tried to rob could close the door all the way one of the guys that was with Mr. Willhite pulled a gun stuck it in the door a [sic] fired one fatal shot that killed the person. He also asked me if I knew Scooter (Darryl Washington) and I said not really but I know who he is. Mr. Willhite then said Mr. Washington was his codefendant yet he was not ever on the scene of the crime but put there."

Hudson's affidavit, dated July 9, 2020, recounted a separate conversation with Willhite:

"The matter at hand came about like this. *** [O]ne day I asked Mr. Wilhite [sic] in confidence did Mr. Washington have anything to do with the crime they both was incarcerated for. Mr. Wilhite said Mr. Washington didn't have anything to do with the crime. Mr. Wilhite went further to say the reason he didn't want to give Mr. Washington an affidavit clearing Mr. Washington that he has a paid lawyer working on his case an [sic] that the outcome of his case would benefit Mr. Washington case also and almost certain that if [he were to] clear Mr. Washington it would kill his chances in court. Mr. Wilhite never admit to me he did the crime that they both was incarcerated for but he gave me the impression he knew more about the case than he was willing to disclose."

¶ 17        The circuit court denied the motion through written order. Washington filed a timely notice of appeal.

¶ 18                                    II. ANALYSIS

¶ 19        An imprisoned person may collaterally attack their conviction by filing a petition in the circuit court pursuant to the Postconviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)). The Act is not a substitute for direct appeal. *People v. Edwards*, 2012 IL 111711, ¶ 21. Rather, it provides a mechanism to raise constitutional issues that escaped earlier review since such issues could not have been raised on direct appeal, generally because the claim relies on matters outside the record. *People v. Blair*, 215 Ill. 2d 427, 447 (2005). The circuit court reviews a petition in a process with up to three stages, the final being an evidentiary hearing where the petitioner must make a substantial showing of a constitutional deprivation to warrant relief. *People v. Pendleton*, 223 Ill. 2d 458, 471-73 (2006). The Act contemplates the filing of a single petition and any issues not raised in the initial petition are deemed waived. *People v. Jackson*, 2021 IL 124818, ¶ 27. However, the Act provides for the filing of a successive petition upon obtaining leave of court. *Id*. A petitioner is entitled to leave to file a successive petition if they establish either (1) cause for failing to include the new issue in the initial petition along with resulting prejudice or (2) a colorable claim of actual innocence. *Id*.

¶ 20        Washington argues that his motion made a colorable claim of actual innocence and, therefore, the circuit court erred in denying him leave to file. He does not advance any arguments regarding his claims of ineffective assistance of counsel. We review the denial of leave to file a successive postconviction petition *de novo*. *Id. De novo* review means that we do not review the circuit court's reasoning. *People v. Jackson*, 2021 IL App (1st) 190263, ¶ 38. Instead, we assess

anew whether the motion made the requisite showing for leave to file, just as a circuit court would. *Id.*

¶ 21        To make a colorable claim of actual innocence, a petitioner must present evidence that (1) is newly discovered, (2) could not have been discovered earlier through due diligence, (3) is material to their innocence and not merely cumulative of evidence presented at trial, and, most importantly, (4) is of such conclusive character that it would probably lead to acquittal on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. The evidence need not be completely exonerating but raise a likelihood that no reasonable juror would convict if such evidence were presented on retrial. *Id.* ¶ 48. For leave to file a successive petition, evidence meets the conclusive character element if it places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.*

¶ 22        At the leave to file stage, we take all well pled allegations in the petition and supporting affidavits as true unless positively rebutted by the trial record. *Id.* ¶ 45. We make no findings of fact nor do we determine the credibility of any affiant. *Id.* Rather, we construe factual allegations liberally in favor of the petitioner. *People v. Allen*, 2015 IL 113135, ¶ 25. But nonfactual and nonspecific assertions that merely amount to conclusions are not sufficient and will be disregarded. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998).

¶ 23        Washington's claim of actual innocence relies on the affidavits from Marshall Hudson and Michael Robinson, who both attest that Washington's codefendant Willhite made statements that Washington was not involved in "the crime." We find the affidavits constitute newly discovered evidence since the ultimate source of the evidence is a codefendant of Washington. Illinois courts have consistently found that statements of a codefendant qualify as newly discovered since no

amount of diligence could force a codefendant to violate their fifth amendment privilege against self-incrimination. *Edwards*, 2012 IL 111711, ¶ 38.

¶ 24    We also find that Willhite's statements are material and not merely cumulative. Material means the evidence is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. The trial evidence established that three individuals perpetrated the shooting. Willhite's admission to his own participation, coupled with the statement that Washington was not involved or present, means that Washington was not one of those three individuals. The State argues that the affidavits are cumulative since Washington presented other evidence at trial to show that he was not present, namely Sam Williams's testimony that Washington had just left the Wicker Park field house headed in the opposite direction from the apartment. We reject this argument. Evidence is not cumulative if it adds to the information that the fact finder heard at trial. *Id.* While the new affidavits may lead to the same conclusion as Williams's testimony—that Washington was not present—it is not cumulative because the jury did not hear Willhite's statements indicating that Washington was not one of the three shooters. The affidavits add new information.

¶ 25    We turn to the most important element: the conclusive character of the new evidence. *Id.* At first glance, the affidavits appear too scant to make out well pled allegations of a colorable claim of actual innocence. They lack detail, are comprised entirely of hearsay, and seem little more than conclusory in nature. Additionally, Robinson's affidavit gets certain details about the shooting wrong. There were three shooters, not one, and at least 10 shots were fired instead of one. Nevertheless, we are mindful that our supreme court has stated a "low threshold" applies to this sort of claim at the leave to file stage. *Id.* ¶ 60. This standard is lower than the substantial showing required at later stages. *Id.* ¶ 58. The petitioner will have the opportunity to address deficiencies with the assistance of counsel, who may be appointed upon granting leave to file. *Allen*, 2015 IL

113135, ¶ 35; 725 ILCS 5/122-4 (West 2020); Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Additionally, hearsay is admissible in postconviction proceedings (*Robinson*, 2020 IL 123849, ¶ 78) and hearsay statements in affidavits must be taken as true at stages preceding an evidentiary hearing. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 117. Likewise, "questions regarding the admissibility and reliability of such evidence are not relevant considerations at the motion for leave to file stage." *Robinson*, 2020 IL 123849, ¶ 81.

¶ 26 Further, while the affidavits contain little information and seem conclusory, liberal construction along with consideration of the trial record makes their exculpatory quality apparent. The crime here was straightforward. Three individuals burst into an apartment and fired shots. The question was the identity of those individuals. Substantial evidence implicated Willhite as one of the shooters. He admitted his involvement to the affiants, directly to Robinson and obliquely to Hudson. While Robinson's affidavit contains some details positively rebutted by the record, he is clearly referring to Green's murder and Willhite's indication that Washington was not there is far more significant. Accepting Willhite's statements as true that Washington "didn't have anything to do with it," as Hudson recounted, or "was not even on the scene," as Robinson relayed, the statements exclude Washington as one of the three shooters and, therefore, demonstrate his innocence. Thus, we find that the statements raise the probability that, more likely than not, no reasonable juror would have convicted Washington in light of Willhite's statements when taken as true. See *id*. ¶ 44 ("leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence.").

¶ 27 In arguing for affirmance, the State likens this case to *People v. Walker*, 2015 IL App (1st) 130530, in which a divided panel of this court affirmed denial of leave to file a claim of actual

innocence premised on an affidavit from a fellow inmate signed 27 years following the triple murder at issue. The fellow inmate attested that he witnessed the 1985 shooting and observed someone for whom he could only give a vague description, but who was not the petitioner, commit the shooting. *Id*. ¶ 6. For several reasons, the court found the affidavit insufficient, including that it "lack[ed] important details that would support its veracity." *Id*. ¶ 21. The affidavit failed to identify the alleged other shooter and it did not mention that three people were shot and killed. *Id*. ¶ 23. Tellingly, the *Walker* majority determined that the affidavit was not credible. *Walker* was decided five years before our supreme court's decision in *Robinson*. *Robinson* makes clear that credibility determinations must not factor into the leave to file analysis. 2020 IL 123849, ¶ 45. The affidavits here resemble the affidavit at issue in *Walker* in that they lack important detail. But evaluating the affidavits as the court did in *Walker* would amount to a credibility determination. Thus, we cannot follow *Walker* since that case does not comport with our supreme court's directive to refrain from making such determinations at this stage.

¶ 28        Instead, we take guidance from two recent appellate decisions finding that leave to file successive postconviction petitions should have been granted for petitioners who claimed actual innocence based on statements from a convicted codefendant that the petitioner was not involved. In *People v. Simms*, 2021 IL App (1st) 161067-B, three codefendants were convicted of a first degree murder and related offenses including home invasion. One codefendant, Lino Niles, provided an affidavit stating, in salient part, Simms "had absolutely no involvement whatsoever" and "me and my other co-defendant Curtis King was the only two involved." *Id*. ¶ 27. Similarly, in *People v. Ruhl*, 2021 IL App (2d) 200402, the petitioner sought leave to file a successive postconviction petition based, in part, on an affidavit from his codefendant attesting that he, the codefendant, committed the murder alone and forced the petitioner to help dispose of the body. *Id*.

¶¶ 51, 95. We find that Willhite's statements in the affidavits from Robinson and Hudson are similar to the statements found to be sufficient to make out a colorable claim of actual innocence in *Simms* and *Ruhl*. All are statements from a convicted codefendant admitting his own guilt but excluding the petitioner from involvement in the crime. Therefore, Washington should be allowed leave to file his successive petition.

¶ 29                                   III. CONCLUSION

¶ 30        For these reasons, we reverse the judgment of the circuit court denying Washington's motion for leave to file a successive postconviction petition and remand for further proceedings under the Act.

¶ 31        Reversed and remanded.